**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
STANDARD INSURANCE COMPANY,                :
                                           :
            Plaintiff,                      :     Case No.: 25-cv-0212
                                           :
      v.                                    :
                                           :
MINNESOTA LIFE INSURANCE COMPANY,          :
and SECURIAN FINANCIAL GROUP, INC.,        :
                                           :
            Defendants.                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## COMPLAINT

Plaintiff Standard Insurance Company ("The Standard"), by its undersigned counsel, for its Complaint against Defendants Minnesota Life Insurance Company ("Minnesota Life") and Securian Financial Group, Inc. ("Securian," and together with Minnesota Life, the "Securian Entities") (collectively, the "Parties"), hereby alleges as follows:

## NATURE OF THIS ACTION

1.      This dispute arises from The Standard's 2022 acquisition of a large-scale retirement plan recordkeeping business (the "Retirement Business" or the "Business") from the Securian Entities (the "Transaction"). Under the terms of the agreement governing the Transaction—the Master Transaction Agreement ("MTA")—the Securian Entities agreed to transfer the Retirement Business to The Standard. The Transaction closed on December 1, 2022.

2.      The Standard pursued the Transaction as a growth opportunity for its retirement business—an opportunity to expand the scale and competitive position of the company's retirement offerings and accelerate diversification and growth in the retirement recordkeeping segment. The Standard anticipated the Transaction would allow it to leverage the Securian Entities' existing relationships with plan sponsors and distribution partners.

1

3.      Central to the deal for The Standard was maintaining the customer experience and relationships with the plans forming the client-base of the Retirement Business.

4.      Since the Transaction's late-2022 closing, a dispute has arisen regarding the Parties' respective obligations under the MTA, requiring The Standard to bring this action seeking declaratory relief from this Court.  The Securian Entities have failed to abide by the terms of the MTA by pursuing a course of conduct aimed at obtaining consideration to which they are not entitled under the MTA's "Earn-Out" provisions.  The Securian Entities claim to be entitled to $50 million under the post-closing "Earn-Out" provisions of the MTA based upon incorrect contractual interpretations that find no support in the MTA.

5.      Given the ongoing nature of the Retirement Business and the importance to The Standard of maintaining favorable relationships with the Securian Entities' former clients, the MTA included specific terms regarding a potential bonus payment (the "Earn-Out Payment") to be paid post-closing depending on how many clients stayed with the Retirement Business in the eighteen months after closing.

6.      The MTA requires the Parties to undertake a defined Earn-Out process post-closing to determine if the Retirement Business met certain performance benchmarks related to the acquired plans that either: (1) definitively terminated or discontinued retirement recordkeeping services with The Standard on or before May 31, 2024 (eighteen months after the close of the Transaction), or (2) provided written notice prior to May 31, 2024 of a definitive intent to terminate or discontinue retirement recordkeeping services.  Under the MTA's terms, The Standard agreed to make an Earn-Out Payment to the Securian Entities ***only if*** the portion of the Retirement Business meeting the above criteria fell below certain agreed-upon thresholds.

7. As of May 31, 2024, the specified performance requirements to entitle the Securian Entities to an Earn-Out Payment were not met. As a result, the Securian Entities were not entitled to an Earn-Out payment.

8. However, in an attempt to circumvent the contractually agreed-upon process and obtain an Earn-Out payment from The Standard, the Securian Entities have advanced flawed and inconsistent interpretations of the MTA's Earn-Out provisions that require adjudication by this Court prior to the Parties' bringing remaining accounting disputes to an independent accounting firm for resolution (as outlined in the MTA).

9. The Securian Entities' positions have no support in the MTA, and adjudication of these and other threshold legal issues is necessary before the Parties can submit suitable disputes to an independent accounting firm. The Standard therefore seeks a declaratory judgment from this Court regarding the Parties' respective rights and obligations relating to the MTA's Earn-Out provisions.

## THE PARTIES

10. Plaintiff Standard Insurance Company is an Oregon-domiciled insurance company, with its principal place of business in Portland, Oregon. The Standard is in the business of providing insurance, retirement and investment products, and retirement and investment services to employers. As part of its retirement and investment services business, The Standard provides financial recordkeeping and administrative services to employer-sponsored retirement plans.

11. Defendant Minnesota Life Insurance Company is a Minnesota insurance company with its principal place of business in St. Paul, Minnesota.

12. Defendant Securian Financial Group, Inc., is a Delaware corporation with its principal place of business in St. Paul, Minnesota. Securian is the parent corporation of Minnesota Life. Securian operates through various subsidiary and affiliated entities, such as Minnesota Life.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

14.     This Court has the authority to grant declaratory relief pursuant 28 U.S.C. §§ 2201 and 2202.

15.     The amount in controversy exceeds $75,000.  The Standard seeks a declaration of its rights and obligations pursuant to the MTA in connection with the Securian Entities' claim to a $50 million Earn-Out Payment.

16.     Venue is proper in this District because the Parties agreed in the MTA that "each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York" and waived any challenge to this District being the venue for suit pursuant to the MTA.

## THE FACTS

### I.    THE STANDARD AGREES TO ACQUIRE THE SECURIAN ENTITIES' RETIREMENT BUSINESS

17.     The Standard, Minnesota Life, and Securian entered into the MTA on October 16, 2022.  In the MTA, The Standard is the "Buyer," Minnesota Life is the "Seller," and Securian is the "Parent."

18.     Under the MTA, The Standard paid significant compensation to the Securian Entities in exchange for acquiring the Retirement Business, which consisted of retirement plans through employers or other organizations that had contracted with the Securian Entities to provide recordkeeping and administrative services and to reinsure the investments held by the plans.

19.     As described in the MTA, The Standard acquired "the business . . . conducted by Seller and its Affiliates through the 'Recordkeeping' division of the 'Retirement Solutions'"

4

segment of the Securian Entities' business, which included "the business of providing recordkeeping services, third-party and proprietary investments (including, as applicable, insurance company separate accounts, mutual funds and collective investment trusts), participant education and guidance services, including the Financial Wellness Tools, and group annuity contracts offering minimum guaranteed withdrawal benefits, in each case, for or in connection with Retirement Plans."

20.    The Transaction would expand The Standard's existing retirement business by adding to its geographic footprint, expanding its distribution network, and enlarging its client base. The Standard's public announcement about the Transaction noted that the deal was intended to "combine[] the recordkeeping business of two providers with award-winning customer service, deep expertise in retirement plan recordkeeping and a shared focus on fiduciary protections and responsibilities."    The announcement further explained that the Parties' "recordkeeping distribution networks and suite of products are highly complementary and, together with a combined geographic presence across the U.S., will enhance future growth opportunities."

## II.    THE EARN-OUT DISPUTE

### A.    Transaction Terms Relevant to the Earn-Out Dispute

21.    The MTA includes a number of provisions that govern post-closing conduct of the Parties, including provisions concerning a potential post-closing bonus payment.  That bonus payment is an "Earn-Out" through which the Securian Entities could be entitled to an additional payment (the "Earn-Out Payment") if the Retirement Business achieved specified client and asset-retention metrics as of a date certain after the Transaction closed.

22.    The Securian Entities and The Standard agreed that The Standard would make an Earn-Out Payment to the Securian Entities only if the percentage of assets in plans which terminated or discontinued retirement recordkeeping services as of May 31, 2024 (the "Earn-Out

Measurement Date"), and plans that had provided written definitive intent to terminate/discontinue retirement recordkeeping service prior to the Earn-Out Measurement Date, fell below certain established thresholds.

23.    Specifically, the Parties negotiated and memorialized in the MTA a process to determine the amount of the Earn-Out Payment (if any), utilizing a measurement referred to in the MTA as the "Total Lapse Rate" ("TLR").  In general terms, the TLR is a measurement of the percentage of total plan assets in the Business that was "lost" in the eighteen months following The Standard's purchase of the Business due to plans' actual or intended termination/discontinuation of retirement recordkeeping services.  The MTA specified potential Earn-Out Payment amounts using a sliding scale for different ranges of TLR to be determined as of the Earn-Out Measurement Date.

24.    To facilitate calculation of the TLR, the MTA included obligations on both The Standard and Minnesota Life to disclose and make available certain information pertaining to active clients of the Business ("Closing Date Clients") at specified intervals following the Transaction's closing.

25.    Five business days after closing, the MTA required Minnesota Life (the "Seller" in the MTA) to furnish The Standard (the "Buyer" in the MTA) with the then-current list of Closing Date Clients and the assets held by each (defined as the "Closing Date Client AUA" (*i.e.*, assets under administration)):

> Seller shall deliver to Buyer, no later than five (5) Business Days following the Closing Date, a statement setting forth (i) each client of the Business as of the Closing Date (each, a "Closing Date Client"), (ii) the AUA as of the Closing Date (the "Closing Date AUA") and (iii) the portion of the Closing Date AUA associated with each Closing Date Client (each such portion, with respect to the associated Closing Date Client, the "Closing Date Client AUA"), together with such schedules and data as may be appropriate to support such statement.

MTA § 2.8(a).

26.     The MTA provided that, during the eighteen months after closing prior to the Earn-Out Measurement Date, The Standard was required to:

>       (i)     use commercially reasonable efforts (without taking into account the possible benefit to Buyer and its Affiliates of not paying the Earn-Out Payment or of paying an Earn-Out Payment of a reduced dollar amount) to retain the Closing Date Clients as customers of Seller, Buyer or their applicable Affiliates, by applying a degree of care and diligence no less stringent than they apply in retaining customers of Buyer and its Affiliates' similar businesses;

>       (ii)    not take, or cause to be taken, any action, including any action with respect to Transferred Employees who are relationship managers or serve in a similar role, that would reasonably be expected to result in a Closing Date Client terminating its relationship with Buyer or Seller (or their applicable Affiliates), unless the primary purpose of such action is a legitimate business purpose other than effecting a reduction or elimination of the Earn-Out Payment . . . .

MTA § 2.8(h).

27.     Ten business days after the Earn-Out Measurement Date, The Standard was required to send an "Earn-Out Statement" to Minnesota Life, setting forth a list of "Lapsed Clients" (defined below), the Closing Date Client AUA associated with each Lapsed Client, and a good-faith calculation of the Earn-Out Payment based on the calculated TLR.  The MTA defines the procedures for determining which clients are Lapsed Clients:

>       Buyer shall deliver . . . a list of each Closing Date Client that has definitively terminated or discontinued (or indicated in a writing (that has not been revoked in writing as of the Earn-Out Payment Date) its definitive intent to terminate or discontinue) its retirement recordkeeping services relationship related to the Business with Seller and Buyer and their respective Affiliates between the Closing Date and the Earn-Out Measurement Date, such that, as of the Earn-Out Measurement Date, there is no continuing retirement recordkeeping services relationship with Seller or Buyer or their respective Affiliates (each, a "Lapsed Client"; provided, that a Closing Date Client shall not constitute a Lapsed Client if a material breach by Buyer of its obligations in Section 2.8(h) has been a contributing factor in the termination of the Closing Date Client's relationship), together with reasonable evidence of such termination . . . .

MTA § 2.8(b).

28.     During the 90 days following Minnesota Life's receipt of the Earn-Out Statement, Minnesota Life was entitled to "reasonable access" to documents relevant to the Earn-Out Statement and to The Standard's knowledgeable employees:

> During the ninety (90)-day period immediately following Seller's receipt of the Earn-Out Statement (the "Earn-Out Review Period"), Buyer shall reasonably cooperate fully with Seller and its Representatives in their review of the Earn-Out Statement, shall provide to Seller and its Representatives reasonable access to (i) all books, records and working papers of Buyer and its Affiliates relevant to the Earn-Out Statement and (ii) employees of Buyer and its Affiliates knowledgeable about the subject matter of the Earn-Out Statement.

MTA § 2.8(c).

29.     The MTA further provides a detailed process for Minnesota Life to disagree with the Earn-Out Statement, in which case Minnesota Life was required to provide The Standard with a written "Earn-Out Notice of Disagreement," which was to "set forth *in reasonable detail* (i) the basis for such dispute, (ii) the amounts involved and (iii) Seller's determination of such disputed amounts and the method thereof." MTA § 2.8(d) (emphasis added).   A 20-business-day consultation period (the "Earn-Out Consultation Period") would thereafter commence.  MTA § 2.8(e).

30.     To the extent the Parties were unable to reach an agreement during the Earn-Out Consultation Period, the MTA provides for an "Independent Accounting Firm" to "review the unresolved item or items" that were "*expressly specified* in the Earn-Out Notice of Disagreement." MTA § 2.8(f) (emphasis added).

31.     The MTA makes clear that the Independent Accounting Firm's authority is limited to accounting and mathematical disputes, and does not include legal issues such as interpretation of the MTA's provisions.  In particular, the MTA states that: "In acting under this Agreement, the

Independent Accounting Firm shall act as experts in accounting *and not as arbitrators*.”  MTA § 2.7(c) (emphasis added).

32.     The MTA otherwise dictates that “with respect to any Action resulting from, relating to or arising out of this Agreement, each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or, if such court will not accept jurisdiction, the Supreme Court of the State of New York or any court of competent civil jurisdiction sitting in New York County, New York.”  MTA § 10.4.  The only disputes specifically excluded by the terms of Section 10.4 are those arising from Section 2.7, which concerns disputes about closing statements unrelated to Earn-Out disagreements.

**B.      The Standard Used Commercially Reasonable Efforts to Retain Plans Post-Closing**

33.     Shortly after the Transaction’s December 1, 2022 closing, Minnesota Life provided a Closing Date Client list, which set forth each Closing Date Client and Closing Date Client AUA, in accordance with the requirements of the MTA.

34.     Over the next 18 months, The Standard used commercially reasonable efforts to retain Closing Date Clients of the Business, efforts that included applying a degree of care and diligence no less stringent than The Standard would apply to retain its other retirement plan clients. These efforts maintained or exceeded the efforts the Securian Entities had employed in the Business prior to closing.

**C.      Eighteen Months After Closing, The Standard Delivers the Earn-Out Statement in Good Faith and in Accordance with the MTA**

35.     Notwithstanding The Standard’s efforts to retain as many Closing Date Clients as possible, some clients nonetheless terminated, discontinued, or otherwise definitively indicated their intent in writing to terminate or discontinue their retirement recordkeeping services

relationship on or before May 31, 2024 (the Earn-Out Measurement Date).  Prior to the Earn-Out Measurement Date, employees of The Standard kept representatives of the Securian Entities regularly apprised of the ongoing Closing Date Client "losses."

36.    On June 14, 2024, The Standard produced the Earn-Out Statement to Minnesota Life in compliance with the disclosure requirements under Section 2.8(b) of the MTA.

37.    In the Earn-Out Statement, The Standard in good faith identified, among other required information, the Closing Date Clients that qualified as "Lapsed Clients" for purposes of the TLR calculation.  Due to the resulting TLR, no Earn-Out Payment was due under the terms of the MTA.

38.    With the exception of Closing Date Clients that had terminated or discontinued retirement recordkeeping services prior to migration to The Standard's recordkeeping platform (based upon an agreement with the Securian Entities), The Standard also provided reasonable evidence of termination/discontinuation or written notice of a definitive intent to terminate/discontinue for Lapsed Clients.  The Standard provided written documentation establishing that the Lapsed Clients had either terminated or discontinued their retirement recordkeeping relationships with The Standard, or had notified The Standard in writing of a definitive intent to terminate/discontinue, as contemplated by the MTA.

**D.    The Earn-Out Review Period and the Earn-Out Notice of Disagreement**

39.    Upon the Securian Entities' receipt of the Earn-Out Statement, the Parties entered into the 90-day "Earn-Out Review Period" prescribed in the MTA.  MTA § 2.8(c).   During the Earn-Out Review Period, and even after that period had elapsed, The Standard reasonably cooperated with the Securian Entities in their review of the Earn-Out Statement and provided reasonable access to (i) all books, records and working papers relevant to the Earn-Out Statement and (ii) employees knowledgeable about the subject matter of the Earn-Out Statement.

10

40.    On September 11, 2024, Minnesota Life sent The Standard an "Earn-Out Notice of Disagreement" (the "Notice").  The Notice purported to dispute the lapsed status of most of the clients identified in The Standard's Earn-Out Statement.

41.    The Notice was deficient and improper in several respects.  First, Minnesota Life challenged the designation of Lapsed Clients based on reasons inconsistent with the definition of a "Lapsed Client" in the MTA.  Second, Minnesota Life failed to set out "in reasonable detail" the basis for each dispute as required by Section 2.8(d) of the MTA.

42.    Despite the lack of any factual support or explanation for why most of the designated plans did not qualify as Lapsed Clients, Minnesota Life demanded a $50 million Earn-Out Payment.

43.    Upon The Standard's receipt of the Earn-Out Notice of Disagreement, the Parties entered the 20-business day "Earn-Out Consultation Period," during which they were to "seek in good faith to resolve any differences that they may have with respect to the matters expressly specified in the Earn-Out Notice of Disagreement."   MTA § 2.8(e).

44.    On September 27, 2024, the Parties agreed to toll the Earn-Out Consultation Period and all obligations required by Section 2.8 of the MTA from September 23 through October 31, 2024.

45.    On November 7, 2024, nearly a week before the conclusion of the Earn-Out Consultation Period, The Standard received a letter from the Securian Entities' counsel seeking to begin the process of identifying an Independent Accounting Firm to consider the disputed items. The letter threatened "to ask the Independent Accounting Firm to compel disclosure of [] documentation, and to draw adverse inferences from Standard's failure to disclose such documentation."

E.      **The Securian Entities Have Advanced Positions Contrary to the Terms of the MTA**

46.     As of the date of this Complaint, the Securian Entities' objections remain in dispute, as the Securian Entities have refused to withdraw even a single objection despite the information and documentation provided by The Standard.

47.     The Securian Entities have made clear that they do not see a path to resolution and desire an Independent Accounting Firm to resolve the dispute.

48.     However, the Securian Entities' disputes and positions raise several threshold legal issues that must be decided by this Court prior to presenting suitable issues to an Independent Accounting Firm.  The Securian Entities have, for example, adopted an interpretation of "Lapsed Client" that is inconsistent with the terms of the MTA in many respects.

49.     The threshold issues regarding the legal interpretation of the definitions and contractual provisions of the MTA must be determined by this Court in order for the Parties to proceed to resolution of remaining issues by an Independent Accounting Firm according to the process set forth in the MTA.  The Standard therefore seeks a declaratory judgment as set forth below.

<u>**COUNT I**</u>
**Declaratory Judgment: Earn-Out**

50.     The Standard reasserts and realleges the allegations in the preceding paragraphs as if fully set forth herein.

51.     The MTA constitutes a binding contract between the Parties.

52.     The Standard exchanged valuable consideration for the Business.

53.     The Standard has carried out its obligations pursuant to the MTA, including by providing the Securian Entities with the required Earn-Out Statement and all required supporting information.  The Standard provided a list of all Lapsed Clients, as well as reasonable evidence of

such Lapsed Clients' termination/discontinuance or intended termination/discontinuance, and other required information pursuant to Section 2.8(b) of the MTA. The Earn-Out Statement properly demonstrated that the Securian Entities were not entitled to an Earn-Out Payment.

54.     The Securian Entities have provided no evidence to suggest that The Standard failed to use commercially reasonable efforts to retain the Closing Date Clients included in the Business. Likewise, the Securian Entities have offered no basis to conclude that The Standard took any action that would have resulted in a client terminating or discontinuing its retirement recordkeeping relationship with The Standard.

55.     The Standard has further satisfied its obligations under Sections 2.8(c) and 2.8(d) of the MTA by reasonably cooperating with the Securian Entities in their review of the Earn-Out Statement, including by providing "reasonable access" to books, records, and working papers of The Standard relevant to the Earn-Out Statement, and providing access to employees of The Standard knowledgeable about the subject matter of the Earn-Out Statement. The Standard has engaged the Securian Entities in good faith throughout the Earn-Out Review Period.

56.     The Securian Entities have now adopted an interpretation of "Lapsed Client" that is inconsistent with the terms of the MTA in many respects.

57.     The Securian Entities informed The Standard that they do not foresee a resolution, and they have made clear their intent to raise their improper assertions before the Independent Accounting Firm.

58.     Accordingly, an actual controversy exists between The Standard and the Securian Entities, as described above. The Parties are at an impasse, as the Securian Entities have made clear that they intend to assert their improper positions before the Independent Accounting Firm,

such assertions would breach the MTA, and a resolution of the Parties' legal disputes is needed prior to presenting suitable issues to the Independent Accounting Firm.

59.     A declaratory judgment as to the dispute would settle legal issues between The Standard and the Securian Entities.

60.     This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

61.     Based upon the foregoing, The Standard requests that the Court enter a declaration finding that the term "Lapsed Client" must be interpreted in accordance with the terms of the MTA.

62.     The Standard further requests that the Court enter a declaration directing that, to the extent an Independent Accounting Firm reviews any Earn-Out disputed items, the Independent Accounting Firm shall apply the findings of the Court with respect to these legal issues and that the Independent Accounting Firm's powers are limited to those delineated in Section 2.8(f) of the MTA.

## PRAYER FOR RELIEF

WHEREFORE, The Standard requests judgment as follows:

a.     declaring that the term "Lapsed Client" must be interpreted in accordance with the MTA, as described above;

b.     declaring that the Independent Accounting Firm act in accordance with the MTA;

c.     awarding The Standard its reasonable attorney's fees and costs; and

d.     such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:   New York, New York          DEBEVOISE & PLIMPTON LLP
         January 9, 2025

*/s/  Susan Reagan Gittes*
Susan Reagan Gittes
David Hotelling

14

66 Hudson Boulevard
New York, New York 10001
srgittes@debevoise.com
djhotell@debevoise.com
(212) 909-6000

*Counsel to Standard Insurance Company*

15